**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALICIA SANCHEZ, as Special Administrator of the Estate of Francisco Marchan, Deceased, | |
| Plaintiff, | Case No. 18 C 8281 |
| v. | Hon. LaShonda A. Hunt |
| CITY OF CHICAGO, et al., | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Alicia Sanchez, as special administrator of the Estate of Francisco Marchan, brings this wrongful death action against various law enforcement officers, the City of Chicago, Cook County Sheriff Thomas Dart, and the County of Cook.[1] Plaintiff alleges that Defendants arrested Marchan and failed to provide appropriate medical care, despite their knowledge that he had been involved in a serious car accident. In the operative amended complaint, she asserts section 1983 claims for denial of medical care, excessive force, failure to intervene, and *Monell* liability, along with statutory claims under the Illinois Wrongful Death Act and Survival Act, and indemnification. Currently pending before the Court are Defendants' motions for summary judgment on all of Plaintiff's claims as well as Defendants' motions to exclude Plaintiff's experts. For the reasons discussed below, Defendants' motions to exclude (Dkts. 262, 263) are granted in part and denied in part, and Defendants' motions for summary judgment (Dkt. 230, 233) are granted.

---

[1] Sherriff Dart and County of Cook are collectively referred to as the "County Defendants."

## BACKGROUND[2]

Plaintiff names the following Chicago Police Department ("CPD") employees as Defendants: Officer James Richards, Jr., Lieutenant Kevin Kendzior, Sergeant Anthony Strazzante, Officer Daniel Cwynar, Officer Mariusz Chojnacki, Sergeant Roberta Bowen, Sergeant William Lohse, and Michael Santiago (collectively, the "CPD Defendants").[3] She also asserts claims against Unknown CPD Officers and Unknown Cook County Sheriff Officers.[4]

### I.  Marchan's Car Accident & Arrest

On November 26, 2017, around 6:24 PM, Francisco Marchan was involved in a traffic accident after failing to stop at a stop sign located on the corner of Lemoyne Street and Pulaski Street in Chicago, Illinois. (Pl. Resp. to County Defs. SOF ¶ 1, Dkt. 250).[5] Marchan's vehicle struck the driver's side of a vehicle driven by Jose Torres. (*Id*. ¶ 2). After the accident, Torres "detained" Marchan and called the police. (*Id*. ¶ 5). Torres noticed Marchan was under the influence of alcohol, was not maintaining his balance while walking, and had a strong smell of alcohol on his breath. (*Id*. ¶ 7). Torres did not see any injuries or blood on Marchan's head or face. (*Id*. ¶ 8).

CPD Officers Pagan and Richards were dispatched to the accident and were the first to arrive at the scene. (Pl. Resp. to City Defs. SOF ¶ 23, Dkt. 253). When they arrived, one of the officers called an ambulance. (Pl. Resp. to County Defs. SOF ¶ 12). Officer Pagan spoke with

---

[2] The facts are taken from the parties' Local Rule 56.1 statements and are undisputed, except where noted.

[3] The CPD Defendants and the City of Chicago are collectively referred to as the "City Defendants."

[4] Although Plaintiff's initial complaint (Dkt. 1-1) named CPD Officer Danny Pagan and Cook County Department of Corrections Officers Micah Coleman, John Vereen, and Sergio Cale as defendants, her amended complaint (Dkt. 66) did not include them.

[5] The County Defendants' Statement of Facts contains separate sections, two of which begin with paragraph 1. The Court's citations to paragraphs 1 through 5 refer to Section II.A.

Torres who explained how the accident happened and expressed his belief that Marchan had been drinking. (Pl. Resp. to City Defs. SOF ¶¶ 24, 25). Officer Pagan then spoke with Marchan, who was standing on the sidewalk. (*Id*. ¶ 26). Officer Pagan noticed that Marchan had slurred speech, blood shot eyes, and was swaying back and forth. (*Id*. ¶ 28). Based on his observations, Officer Pagan believed Marchan was intoxicated. (*Id*.) After speaking with Torres and Marchan, Officers Pagan and Richards examined the damage to the vehicles. (*Id*. ¶ 29). While examining Marchan's vehicle, they observed a six-pack of beer on the passenger-side floor, and one open can of beer. (*Id*.)

CPD Officers Cwynar and Strazzante also responded to the scene. (*Id*. ¶ 32). The City Defendants contend, however, that Officers Cwynar and Strazzante did not have any interaction with Marchan; instead, they removed pedestrians from the sidewalk and completed a tow report of Marchan's vehicle. (*Id*. ¶¶ 32-33).

An ambulance arrived at the accident scene approximately 15 to 20 minutes after the first patrol car arrived. (Pl. Resp. to County Defs. SOF ¶ 13). A firetruck also came to assist. (*Id*. ¶ 14). The City Defendants contend the paramedics spoke with and evaluated Marchan and Torres and both men refused medical treatment. (Pl. Resp. to City Defs. SOF ¶ 31). Plaintiff, however, disputes whether Marchan was evaluated and refused treatment. (*Id*.)

At some point, Officer Pagan performed a name check and discovered that Marchan had an active warrant for his arrest in connection with another DUI. (*Id*. ¶ 34). Thus, Officer Pagan decided to arrest Marchan and charge him with various traffic offenses, including driving under the influence of alcohol. (*Id*. ¶ 35). Officer Pagan told Marchan about the charges, placed him in handcuffs, and walked him towards the patrol car. (*Id*. ¶ 36).

While at the scene of the accident, Officers Pagan and Richards did not notice any injuries, bruises, or bloodstains on Marchan, and Marchan did not complain of any pain. (*Id*. ¶¶ 37-38). The City Defendants contend, but Plaintiff disputes, that Officers Cwynar and Strazzante also did not notice any injuries on Marchan. (*Id*. ¶ 37). Additionally, the City Defendants contend that at no time did Officers Pagan, Richards, Cwynar, or Strazzante use force against Marchan—they did not kick, punch, strike, or otherwise apply pressure to Marchan's head, neck, shoulders, chest, or back. (*Id*. ¶ 40-41).

Officers Pagan and Richards transported Marchan to the 25th District police station for processing. (*Id*. ¶ 42). Upon arrival, Marchan was placed in a holding cell. (*Id*. ¶ 43). Because he had more experience processing DUI arrests, Officer Mariusz Chojnacki agreed to assist Officers Pagan and Richards with processing Marchan. (*Id*. ¶ 44). Pursuant to CPD processing procedures, Marchan was placed under observation for 20 minutes. (*Id*. ¶ 45). Marchan's speech was still slurred, and his eyes were bloodshot and glassy; however, Marchan remained cooperative and did not complain of injury. (*Id*. ¶ 47; Alcohol/Drug Influence Report, Dkt. 234-19).[6]

At 9:04 PM, Officers Chojnacki and Pagan took Marchan to another room in the police station to administer a breathalyzer test; the results revealed that Marchan had a blood-alcohol level of .366. (*Id*. ¶ 48). After the breathalyzer test, Marchan was taken back to the holding cell, advised of his *Miranda* rights, and agreed to answer questions. (*Id.* ¶ 49). According to the Alcohol/Drug Influence Report, during the interview, Marchan correctly identified the day of the week, admitted he was operating a vehicle, identified the intersection where the car accident

---

[6] Plaintiff objects to the Alcohol/Drug Influence Report as inadmissible hearsay. However, the Court finds the report is a public record that is admissible under Federal Rule of Evidence 803(8) as it records the observations of the officers. *See Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013) (Police reports, though generally excluded from consideration under hearsay rules, are allowed under the public records exception to the extent they incorporate firsthand observations of the officer.)

occurred, and identified his direction of travel at the time of the collision. (*Id*. ¶ 50). When asked if he was ill, Marchan said he had "liver problems." (*Id*. ¶ 51). Following the interview, the officers completed their reports and submitted them to a supervisor for review. (*Id*. ¶ 53).

Lieutenant Kevin Kendzior reviewed and approved the arrest report while Sergeant William Lohse reviewed and approved the traffic crash report, vehicle impound, and tow reports. (*Id*. ¶ 54). The parties dispute whether Lieutenant Kendzior, Sergeant Lohse, or Sergeant Roberta Bowen observed or had any communication with Marchan. (*Id*. ¶ 55).

Around 10:11 PM, Officers Pagan and Richards took Marchan to lockup. (*Id*. ¶ 56). Three detention aids were on duty: Michael Santiago, Al Pacheco, and Charles Wood. (*Id*. ¶ 57). Santiago conducted a visual inspection of Marchan and asked him a series of screening questions, marking his responses on an arrest report. (*Id*. ¶ 58; Arrest Report, Dkt. 234-17). According to the arrest report,[7] based on the visual inspection, Santiago noted that Marchan displayed no signs of pain, injury, or infection; appeared to be under the influence of drugs or alcohol but was not showing signs of withdrawal; did not seem despondent or irrational; and was not carrying medication. (*Id*. ¶ 59; Arrest Report at 4). Santiago recorded Marchan's responses to the screening questions, marking a "No" in response to whether this was his first arrest; whether he had ever attempted suicide or serious harm; whether he had serious medical or mental problems; and whether he was deaf, hard of hearing, or needed an interpreter for court. (*Id*. ¶ 60; Arrest Report at 4). Santiago also noted that Marchan had a medical condition relating to his liver, was taking prescription medication, and that his next dose was due at 9:00 AM the following day. (*Id*. ¶ 61; Arrest Report at 4). In the narrative section entitled "questionnaire remarks," Santiago wrote that Marchan

---

[7] Plaintiff also objects to the arrest report as inadmissible hearsay. Again, the Court finds that the report is a public record that is admissible under Federal Rule of Evidence 803(8) as it records the observations of the officers. *See Jordan*, 712 F.3d at 1133.

reported being in "good health," "had a couple of beers after work." (*Id*. ¶ 62; Arrest Report at 4). Santiago also noted that Marchan "came into lockup with a strong odor of alcohol, blood shot eyes, and unable to maintain [his] balance," and "takes multiple meds for his liver." (*Id*.) Santiago estimates that his conversation with Marchan lasted approximately 10 minutes. (*Id*. ¶ 63). Additionally, Plaintiff contends, but the City Defendants dispute, that Santiago notified the desk sergeant that Marchan needed to go to the hospital, but the desk sergeant refused his request. (City Defs. Resp. to Pl. SOAF ¶ 8, Dkt. 265).

Following the screening, Marchan was received in lockup where he was fingerprinted and photographed. (Pl. Resp. to City Defs. SOF ¶¶ 64-65). After the booking photographs, Marchan was placed in a one-person cell. (*Id*. ¶ 66). The City Defendants contend, but Plaintiff disputes, that detention aids visually inspected Marchan every 15 minutes and nothing unusual happened. (*Id.* ¶ 67).

The next morning, at approximately 7:20 AM, Marchan was released from lockup and transferred to the Cook County Department of Corrections ("CCDOC"). (Pl. Resp. to City Defs. SOF ¶ 68; Pl. Resp. to County Defs. SOF ¶ 24). The City Defendants contend that at no time while Marchan was in CPD custody did any officers or detention aides kick, punch, strike, apply pressure to, or use force against him. (Pl. Resp. to City Defs. SOF ¶ 69). However, Plaintiff asserts that while he was in CPD custody, Marchan told his sister, Margie Mukite, that an "aggressive" officer beat him up. (City Defs. Resp. to Pl. SOAF ¶ 1). Additionally, the City Defendants contend that while in police custody, Marchan never requested medical care or complained of any injuries to any CPD officers or detention aids. (Pl. Resp. to City Defs. SOF ¶ 70).

## II.   **Marchan's Detention at CCDOC**

While Plaintiff disputes the facts related to Marchan's condition upon his arrival at the CCDOC, video footage shows that he was able to walk on his own, maintained his balance, and displayed no visible signs of injuries. (Pl. Resp. to County Defs. SOF ¶ 25; Video Ex., Dkt. 232-11). Upon his arrival at CCDOC, Marchan went through receiving, booking, and two intake medical screening processes where he was seen by Nurse Rebultant, Social Worker Vanduan, and Physician Assistant Sanchez. (*Id*. ¶ 26).

During the intake medical screening, Marchan told Vanduan "I feel awful and I'm shaking and my liver is hurting." (County Defs. Resp. to Pl. SOAF ¶ 3, Dkt. 261). Additionally, Vanduan noted in Marchan's medical records that he "visually appeared to be in discomfort." (*Id*. ¶ 6). Nurse Rebultant also noted that Marchan was shaking. (*Id*. ¶ 5). Marchan reported that he had been drinking "about 30 cans per week" for "about 31 years." (Pl. Resp. to County Defs. SOF ¶ 29). Marchan was referred to Division 08 RTU-Detox. (*Id*. ¶ 31).

While going through the booking process, Marchan called his youngest daughter. (*Id*. ¶ 27). The County Defendants contend that during the call, Marchan communicated clearly and did not make any complaints regarding his health.[8] (*Id*.; Audio Ex., Dkt. 232-16.)

On November 28, 2017, around 1:00 AM, Marchan was taken to his housing assignment in Dorm 2B, Division 08 RTU. (Pl. Resp. to County Defs. SOF ¶ 32). Plaintiff disputes what happens during this time, but the facts are confirmed by the video evidence. Specifically, Marchan made his bed, consumed food, and laid in bed thereafter. (*Id*.; Video Ex. 232-15-A; Video Ex. 232-15-C; Video Ex. 232-15-D). At approximately 4:07 AM, Marchan woke up, walked to another area

---

[8] Because parts of the call are unintelligible and other parts appear to be in a foreign language, the Court is unable to confirm whether Marchan made any complaints about his health.

of the jail, then laid in bed again. (Pl. Resp. to County Defs. SOF ¶ 33; Ex. 232-15-E; Ex. 232-15-F).

Around 4:45 AM, Nurse Lee saw Marchan as part of routine protocol, and provided him with medications prescribed to treat symptoms of alcohol withdrawal. (Pl. Resp. to County Defs. SOF ¶ 34). At that time, Marchan was not sweating, he did not have anxiety, tremors, or itching, and he did not have any auditory or visual disturbances. (*Id.* ¶ 35).

Video evidence further shows that, around 6:28 AM, Marchan was walking around the dorm. (*Id.* ¶ 36; Video Ex. 232-15-B). At 6:30 AM, Marchan walked from his tier to the staging area outside the officers' station. (Pl. Resp. to County Defs. SOF ¶ 37; Video Ex. 232-18-A). Around 6:38 AM, Marchan and approximately six other detainees gathered in the hallway outside the officers' station so that they could be escorted to court. (*Id.* ¶ 38; Video Ex. 232-18-B). Around 6:40 AM, the group began to walk down the hall towards the elevators. (*Id.* ¶ 39; Video Ex. 232-19). Almost as soon as the group of detainees began to move, Marchan lagged behind the line, lost his balance, and stumbled. (*Id.* ¶ 40; Video Ex. 232-19). At approximately 6:41:50 AM, Marchan fell to the floor in front of the dispensary room. (*Id.* ¶ 41; Video Ex. 232-19). At 6:42:08 AM, he stood up struggling. (*Id.* ¶ 42, Video Ex. 232-19). At 6:42:20 AM, two CCDOC officers approached Marchan while he was leaning against the wall. (*Id.* ¶ ¶ 43, Video Ex. 232-19). Officer Coleman observed that Marchan had a small cut above his eye that had some bleeding and "he was sweating like he had just ran a mile." (*Id.* ¶ 44). At 6:42:46 AM, Nurse Lee came to see Marchan. (*Id.* ¶ 45; Video Ex. 232-19). At 6:43:16 AM, less than two minutes after Marchan's fall, Nurse Lee and Officer Coleman took Marchan inside a nursing medical room referred to as the dispensary. (*Id.* ¶ 46; Video Ex. 232-19). At 6:44:43 AM, Nurse Adelaja also came to the dispensary. (*Id.* ¶ 47; Video Ex. 232-19).

After Nurse Lee checked Marchan's vital signs at 6:44 AM, she decided to send Marchan to Cermak Immediate Care ("Cermak"). (*Id.* ¶ 53). Marchan told Nurse Lee that he wanted to go to court instead of going to Cermak; however, Nurse Lee advised Marchan that he was going to be seen by a doctor. (*Id.* ¶ ¶ 56). The County Defendants contend that Marchan's symptoms at the time did not necessitate contacting 911. (*Id.* ¶ 54). Additionally, the County Defendants contend that Marchan was conscious at all times before, during, and after his fall. (*Id.* ¶ 55).

Nurse Adelaja and Officer Coleman transported Marchan to Cermak in a wheelchair. (*Id.* ¶ 59). Officer Coleman volunteered to push Marchan's wheelchair to Cermak because Marchan was too big for Nurse Adelaja to push on her own. (*Id.* ¶ 60). They arrived at the nurses' station around 6:56 AM. (*Id.* ¶ 61).

Dr. Khan examined Marchan around 7:17 AM and subsequently requested that Marchan be taken to the Stroger Hospital (*Id.* ¶ 62). Marchan's medical records indicate that, at that time, he was "normally developed," alert, and oriented.[9] (*Id.* ¶ 63; Medical Records, Dkt. 232-28 at 13). At approximately 7:55 AM, Superior Ambulance escorted Marchan from Cermak to Stroger Hospital.[10] (*Id.* ¶ 64; Incident Report, Dkt. 232-29 at 2).

## III. <u>Marchan's Death</u>

When Marchan was admitted at Stroger Hospital, he was not able to speak or move purposefully, and was showing signs of deep brain injury. (Pl. Resp. to County Defs. SOF ¶ 65). Upon examination of Marchan, Dr. Timothy Richardson did not observe any major external signs

---

[9] Plaintiff objects to the medical records as inadmissible hearsay; however, the Court finds that the records are admissible under Federal Rules of Evidence 803(4) (medical records exception) or 803(6) (business records exception). *See Cook v. Hoppin*, 783 F.2d 684, 690 (7th Cir. 1986) (Under Rule 803(4) statements that are reasonably pertinent to a physician in providing treatment are admissible); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 840 (7th Cir. 2014) (finding the medical providers' certification would be admissible under 803(b) if the proper foundation were laid).

[10] Plaintiff objects to the incident report as inadmissible hearsay; however, the Court finds that it is admissible under Federal Rules of Evidence 803(6) as a business record and 803(8) as a public record.

of traumatic injury. (*Id*. ¶ 66). A CT scan of Marchan's head revealed that he was experiencing a large amount of bleeding in the ventricles of the brain. (*Id*. ¶ 70). On November 29, 2017, around 1:45 PM, Marchan was declared brain dead. (*Id*. ¶ 72; Medical Records, Ex. 232-33 at 193). Around 4:30 PM, Marchan was taken off life support and pronounced deceased in the presence of his family. (Pl. Resp. to County Defs. SOF ¶ 74).

## IV.    **Marchan's Postmortem Evaluation**

A postmortem examination was performed on November 30, 2017, by Dr. Michael Eckhardt of the Cook County Medical Examiner's Office. (Pl. Resp. to County Defs. SOF ¶ 88; Pl. Resp. to City Defs. SOF ¶ 83). The examination revealed that Marchan's death was due to natural causes. (Pl. Resp. to County Defs. SOF ¶ 88). Specifically, Marchan died of an intracerebral hemorrhage due to hypertensive cardiovascular disease and chronic ethanolism (alcoholism). (Pl. Resp. to County Defs. SOF ¶ 89). During the external examination, Dr. Eckhardt observed eight blunt force trauma injuries on Marchan's body, including an abrasion above Marchan's right eye and bruises on the right side of his chest, right upper arm, left upper arm, lower right side of the abdomen, right hip, and anterior right pelvis. (Pl. Resp. to City Defs. SOF ¶ 84; City Def. Resp. to Pl. SOAF ¶ 3). At his deposition, Dr. Eckhardt explained that none of the eight blunt trauma injuries had any causal relationship to the intracerebral hemorrhage or hypertensive cardiovascular disease. (Pl. Resp. to City Defs. SOF ¶ 87). Dr. Eckhardt could not opine as to when the intracerebral hemorrhage began. (City Defs. Resp. to Pl. SOAF ¶ 34).

## V.    **Marchan's Prior Medical History**

Prior to his death, Marchan had issues with alcoholism. (Pl. Resp. to City Defs. SOF ¶ 16). Additionally, Marchan's high international normalized ratio (INR) levels and low platelet count placed him at a high risk for severe bleeding. (Pl. Resp. to County Defs. SOF ¶ 83). Plaintiff

disputes many of the facts related to Marchan's medical history; however, these facts are corroborated by Marchan's medical records, which, as discussed above, are admissible and can be properly considered.

More than a year before his death, from July 11, 2016, to July 14, 2016, Marchan was hospitalized at AMITA Health Saint Mary of Nazareth Hospital ("AMITA Hospital") for alcohol intoxication and epigastric pain. (Pl. Resp. to County Defs. SOF ¶ 75; AMITA Discharge Summary, Dkt. 239). According to Marchan's medical records, during this time he was given various diagnoses, including portal hypertensive gastropathy, liver cirrhosis, alcohol intoxication, pancytopenia, small left inguinal hernia, and acalculous cholecystitis. (Pl. Resp. to City Defs. SOF ¶ 20; AMITA Discharge Summary). Upon his discharge, Marchan was prescribed medication to prevent any further complications from the liver cirrhosis and was informed that drinking alcohol would cause further harm and severe health complications. (Pl. Resp. to County Defs. SOF ¶ 78; AMITA Discharge Summary).

Marchan was admitted to AMITA Hospital again from July 31, 2016, to August 5, 2016, for acute alcoholic hepatitis. (Pl. Resp. to County Defs. SOF ¶ 80; Medical Records, Dkt. 232-35, at 25-31). During his second hospital stay, Marchan was given various diagnoses including gastritis, advanced liver cirrhosis, possible acute alcoholic hepatitis, hyperbilirubinemia, and coagulopathy secondary to alcoholic liver disease. (Pl. Resp. to County Defs. SOF ¶ 82; Medical Records, Dkt. 232-35, at 25-31). Upon his discharge on August 5, 2016, Marchan was prescribed medication to help with the fluid in his stomach, as well as the itching and portal hypertension, and was advised to follow a hepatic diet and avoid alcohol. (Pl. Resp. to County Defs. SOF ¶ 87; Medical Records, Dkt. 232-35 at 25-31).

**VI.** **Procedural History**

Following Marchan's death, this litigation ensued. After completing discovery, Defendants filed summary judgment and *Daubert* motions, all of which are fully briefed and ripe for ruling.

## LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In cases where the movant does not bear the burden of proof, the movant must simply point to an absence of evidence to support the nonmovant's case. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *Celotex*, 477 U.S. at 324, and support their position with "more than a scintilla of evidence." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). All facts and inferences are construed in the light most favorable to the nonmoving party. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017). Additionally, the Court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advocate Health & Hosps., Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The Seventh Circuit has articulated a three-part analysis for considering whether to admit expert testimony under Rule 702 and *Daubert*—the trial court must consider (1) the expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The Court is

the gatekeeper of expert testimony, and the key to the gate is not the ultimate correctness of the expert's conclusions; rather, it is the soundness and care with which the expert arrived at their opinion. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015).

## DISCUSSION

## I. Motions to Exclude Experts

The City Defendants moved to exclude the opinions and testimony offered by Plaintiff's experts Ronald Janota and Dr. Holleh Husseinzadeh and to exclude the undisclosed expert opinions of Drs. Richardson, Eckhardt, and Cristina Borraccini. Additionally, the County Defendants moved to exclude Janota's opinions and testimony. The Court examines the admissibility of each witness's opinions and testimony below.

### A. Ronald Janota

Janota offers opinions regarding whether the involved officers complied with applicable CPD and Cook County Sheriff's Office ("CCSO") policies and procedures and if the alleged lack of compliance caused Marchan's death. Specifically, Janota opined as follows:

- Opinion #1: Marchan was not examined at the scene of the accident or taken to a facility for emergency medical treatment; instead, he was arrested and transported to the CPD. The officers ignored Marchan's injuries and personal safety, which was the proximate cause for his death. (Janota's Report, Dkt. 261-1 at 6).

- Opinion #2: The CPD and the CCSO failed to supervise and discipline officers who violated CPD's General and Special Orders. (*Id.* at 9).

- Opinion #3: CCDOC Officers and medical staff violated personnel policies, which resulted in the denial of adequate medical care and jeopardized the safety and life of Marchan. (*Id.* at 10).

Additionally, Janota provided a summary of his overall opinion: "Had the [CPD] and [CCSO] followed their own internal policies and procedures and conformed to industry standards, more likely than not, [Marchan] would be alive today." (*Id.* at 13).

Defendants argue that Janota's opinions should be excluded because (1) he is not qualified to render them; (2) they are not supported by his methodology, (3) they are irrelevant and unfairly prejudicial, and (4) they consist of improper conclusions of law. While the Court finds that Janota is qualified to opine on law enforcement practices, his methodology is proper, and those opinions may be relevant, his opinions as to proximate cause are barred because he is not qualified to provide a medical opinion.

### 1.    <u>Janota's Qualifications</u>

Rule 702 makes clear that a witness may be qualified to offer an expert opinion by knowledge, skill, experience, training, or education. Janota has approximately 28 years of active law enforcement service in a variety of different fields, including supervisory, policy making, and command positions. (*See* Janota's Report at 6). While Janota undisputably has extensive experience in law enforcement, that does not mean that he is qualified to opine on all law enforcement subjects. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("True, simply because a doctor has a medical degree does not make him qualified to opine on all medical subjects."). In determining whether an expert is qualified, the court must ask "not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Id.*; *see also Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.").

First, Defendants argue that Janota's opinions about proximate cause and whether Marchan would still be alive today are medical opinions that are outside of his expertise and therefore must be excluded. The Court agrees. *See Richman v. Sheahan*, 415 F. Supp. 2d 929, 941 (N.D. Ill. 2006)

(finding that plaintiff's experts, who had experience in law enforcement, were qualified to opine about the degree of force used by officers, but their opinions about the proximate cause of plaintiff's death were "far outside the realm of their expertise").

Additionally, the City Defendants argue that Janota is not qualified to provide an expert opinion in this case because he does not have a specific understanding of CPD training and policies. They contend that Janota's opinions are based on the fact that he could not find information that he was looking for in the documentation provided, and thus erroneously concluded that CPD policies must have been violated. Similarly, the County Defendants argue that Janota is not qualified to opine as to Sheriff Dart's conduct because he has never worked in a correctional capacity at a jail or prison. In response, Plaintiff argues that Janota's experience in the field of police practices satisfies the requirements of Rule 702. Plaintiff has the better argument.

Even though he may not have specific experience with the CPD or the CCDOC, Janota's education and experience demonstrates that he has sufficient law enforcement experience to be qualified as an expert witness in the general field of law enforcement practices. *See Paine ex rel. Eilman v. Johnson*, No. 06 C 3173, 2010 WL 785398, at *2 (N.D. Ill. Feb. 26, 2010) (finding that head of university police department was "qualified as an expert witness in the general field of law enforcement practices[,]" even though he had not served in police department that was similar in size to the CPD); *see also Traharne v. Wanye/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 706 (N.D. Ill. 2001) ("The requirement that an expert be qualified by knowledge, skill, experience, education, or training should not be viewed as being particularly rigorous. A witness may qualify as an expert even if the opposing party can point to deficiencies in his or her qualifications.").

2. __Reliability of Janota's Methodology__

When evaluating the reliability of expert testimony, the Court may consider the following non-exhaustive list of factors: (1) whether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021) (citing *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003)). The Rule 702 inquiry is "a flexible one;" the court has wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011).

Here, the City Defendants argue that Janota's "*ipse dixit*" opinions are not reliable because there is no link between the record and his opinions. (City Defs. Mot. to Bar at 4, Dkt. 263). Specifically, the City Defendants contend that Janota cherry picked testimony to support his opinion while ignoring other testimony and facts that do not align with his conclusions. For example, Janota determined that Marchan was not treated by first responders on the scene, even though Officer Pagan testified that the Chicago Fire Department offered Marchan treatment and Marchan refused. Additionally, Janota concluded that the CPD failed to train and discipline its officers without reviewing the disciplinary histories of the CPD Defendants or CPD training materials. Likewise, the County Defendants argue that Janota's opinion that the CCSO failed to supervise and discipline officers is based on policies that do not even apply to the Sheriff's office. In response, Plaintiff argues that Janota applied a "long-recognized" methodology, as he developed an understanding of the facts of this case, analyzed Defendants' acts and omissions, compared

16

them to standard practices and training, and explained the difference between what Defendants did and what applicable practices required.

The Court agrees that "[t]his methodology fits the factual and legal context of this case." *Lees v. Carthage Coll.*, 714 F.3d 516, 524 (7th Cir. 2013) (finding that methodology was "technical" and "specialized" within the meaning of Rule 702, where expert reviewed witness statements, security protocols, and compared defendants' practices against authoritative set of recommended practices); *see also Blackmon v. City of Chi.*, No. 19 C 767, 2022 WL 21296465, at *3 (N.D. Ill. Aug. 30, 2022) (finding that police practices expert used a reliable methodology where he reviewed the information provided to him to gain an understanding of the facts and analyzed the actions of officers involved in the case by comparing them with best practices gleaned through his years of experience and nationally accepted standards).

Furthermore, Janota's alleged failure to consider relevant evidence is an issue that could be explored on cross-examination if this case were to continue to trial. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) ("So long as the principles and methodology reflect reliable scientific practice, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (internal quotations omitted). Contrary to Defendants' assertions, while Janota's opinions may rely on incorrect data, they are not "*ipse dixit*" as there is some connection between the data employed and the opinion offered. *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 809 (7th Cir. 2013) ("[A]n expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility.").

### 3. **Relevance of Janota's Opinions**

For an expert's testimony to qualify as "relevant" under Rule 702, it must assist the jury in understanding the evidence or determining any fact at issue in the case. *Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000); *Andersen v. City of Chi.*, 454 F. Supp. 3d 808, 815 (N.D. Ill. 2020) (citing *Myers v. Ill. Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). The expert's testimony need not relate to the ultimate issue in order to be relevant under Rule 702. *Smith*, 215 F.3d at 721. Here, the City Defendants argue that Janota's opinions regarding violations of CPD policies are irrelevant because "the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." (City Defs. Mot. to Bar at 8) (quoting *Thompson v. City of Chi.*, 472 F.3d 444, 454 (7th Cir. 2006)). Plaintiff contends, however, that expert testimony regarding professional standards can give a jury a "baseline" to help evaluate whether Defendants' deviations from such standards rise to the level of a constitutional violation. (Pl. Resp. to Mot. to Bar at 21, Dkt. 272).

"While there are instances where national police standards are relevant to excessive force claims, 'evidence of purely localized police procedure is less likely to be helpful.'" *Garrit v. City of Chi.*, No. 16 C 7319, 2022 WL 124554, at *6 (N.D. Ill. Jan. 13, 2022) (quoting *United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017)). Based on this principle, the court in *Garrit* excluded expert testimony regarding whether the officers' conduct was consistent with CPD's use of force policies. 2022 WL 124554, at *6. In making this determination, the court reasoned that "a police officer's compliance with the rules of his department is neither sufficient

nor necessary to satisfy the Fourth Amendment's reasonableness requirements." *Id*. (citing *United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017)).

While the Court agrees that Janota's opinions regarding the violation of policies may not be helpful to establishing Plaintiff's constitutional claims, Plaintiff also asserts claims under Illinois state law. The City Defendants have not pointed to any cases to demonstrate that Janota's opinions regarding policy violations are not relevant to Plaintiff's state law claims. (*See* City Defs. Mot. to Bar at 9 (arguing only that "violations of City policy have no relevance to Plaintiff's *federal* claims" (emphasis added)).

Additionally, Defendants contend that Janota's opinions that Marchan would still be alive today if he was taken to a hospital is based on nothing other than Janota's common sense, and therefore, it does not concern a matter beyond the understanding of the average person. As discussed *supra*, the Court has determined that Janota is not qualified to opine regarding proximate cause; thus, the Court agrees that any opinion he offers related to those issues is not based on any specialized knowledge, skill, experience, training, or education, and therefore unhelpful to the jury.

Furthermore, Defendants argue that Janota's testimony regarding proximate cause should be barred because proximate cause is a determination for the trier of fact. Defendants are correct. An expert witness "cannot offer an opinion that amounts to a legal conclusion, i.e. testimony that does little more than tell the jury what result to reach, because such testimony is not helpful to the jury and because its probative value is substantially outweighed by the danger of unfair prejudice." *United States v. Caputo*, 382 F. Supp. 2d 1045, 1049 (N.D. Ill. 2005) (citing *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003)). Here, Janota's opinion about the proximate cause of Marchan's death is an improper legal conclusion, given that proximate cause is a necessary legal element of several of Plaintiff's claims. *See Sanders v. City of Chi.*

*Heights*, No. 13 C 0221, 2016 WL 4417257, at *6 (N.D. Ill. Aug. 19, 2016) ("The Court agrees that [defendant's expert] cannot testify that there was probable cause to arrest [plaintiff] because it is a legal conclusion, which is outcome determinative because probable cause is a necessary element of [plaintiff's] common law malicious prosecution claim.").

In sum, the Court finds that while Janota is qualified to testify as an expert on certain police practices, his opinions related to the proximate cause of Marchan's death are excluded.

### B.     Dr. Holleh Husseinzadeh

In this case, Dr. Husseinzadeh opined that "all persons involved in a vehicular accident where there is significant structural damage to the encasing vehicle should undergo medical examination." (Husseinzadeh's Report, Dkt. 197-1 at 1). Despite providing this opinion, Dr. Husseinzadeh explained that in Marchan's case there was "not a clear mechanistic tie" between the initial accident and the mode of death, as the type of intracranial hemorrhage Marchan suffered from "follows a pattern more associated with chronic damage to the blood vessels of the brain sustained over many years from chronic medical conditions." (*Id.*) The City Defendants contend that Dr. Husseinzadeh's opinion should be excluded because (1) her medical expertise does not qualify her to make an opinion regarding car accidents, (2) her methodology does not support her opinion, and (3) her opinion does not aide the trier of fact. The Court agrees.

### 1.     Dr. Husseinzadeh's Qualifications

Dr. Husseinzadeh is a board-certified doctor in internal medicine and hematology. The City Defendants contend that her opinion is outside her area of expertise as she has no experience dealing with vehicle collisions, airbags, or significant structural damage. Plaintiff, on the other hand, contends that her opinion is a medical opinion—not an opinion on car accidents or accident reconstruction. While the Court finds that Dr. Husseinzadeh is qualified to opine on the type of

20

intracranial hemorrhage Marchan suffered from and the likely causes of it, the Court is not convinced that Dr. Husseinzadeh is qualified to opine regarding the treatment of accident victims because Plaintiff has not demonstrated that her medical expertise involves working with individuals who have been involved in car accidents. Thus, while portions of Dr. Husseinzadeh's testimony are within her area of expertise, her conclusion regarding the treatment of accident victims must be excluded.

### 2. Reliability of Husseinzadeh's Methodology

The City Defendants argue that Dr. Husseinzadeh did not use any methodology to support her "*ipse dixit*" opinion. There is some merit to the City Defendants' argument. Dr. Husseinzadeh reviewed the available medical records, medical examiner report, and photographs of the vehicles that were involved in the accident. Generally, courts have found that reviewing autopsy reports, medical records, and testimony from witnesses constitutes a reliable methodology. *See Gayton*, 593 F.3d at 618 (finding that expert's methodology, which consisted of reviewing autopsy report, medical records, and testimony of prison guards and witnesses, was reliable); *Hall v. Flannery*, 840 F.3d 922, 928 (7th Cir. 2016) (finding that expert's opinions were based on sufficiently reliable methodology where expert reviewed autopsy report, medical records, and deposition testimony).

However, the flaw with Dr. Husseinzadeh's opinion is that she makes an unsupported leap from determining that Marchan's "type of intracranial hemorrhage follows a pattern more associated with chronic damage to the blood vessels of the brain" to concluding "that all persons involved in a vehicular accident where there is significant structural damage to the encasing vehicle should undergo a medical examination." (Husseinzadeh's Report at 1). "It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir.

21

2003). Such a connection is missing here; thus, Dr. Husseinzadeh's opinion must be excluded for this additional reason. *See Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) ("A court should not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (internal quotations omitted).

### 3.  Relevance of Dr. Husseinzadeh's Opinion

Finally, the City Defendants argue that Dr. Husseinzadeh's opinion does not aid the trier of fact because it is overly broad, speculative, and does not provide a conclusion or opinion beyond the common sense of an average person. Because the Court has already determined that Dr. Husseinzadeh's testimony is inadmissible, the Court need not address this issue.

In sum, while Dr. Husseinzadeh may opine on the type of intracranial hemorrhage Marchan suffered from and the likely causes of it, she may not provide an opinion regarding the treatment of accident victims.

### C.  Undisclosed Experts

In her response to Defendants' motions for summary judgment, Plaintiff relies on the testimony of Marchan's treating physicians, Drs. Richardson and Borraccini, and the medical examiner, Dr. Eckhardt. The City Defendants contend that Plaintiff's reliance on testimony from these individuals is improper because their testimony goes beyond the scope of their treatment of Marchan and delves into opinion testimony regarding general, hypothetical situations. Plaintiff asserts, however, that Drs. Richardson and Borraccini are witnesses who were called by the defense to testify regarding Marchan's treatment and medical condition. Additionally, Plaintiff contends that she previously disclosed Dr. Eckhardt.

If treating physicians will present expert opinion testimony, they must be disclosed pursuant to Rule 26(a)(2). *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004).

Indeed, "[a] treating physician is not automatically an 'expert' witness simply because he is a doctor." *Tzoumis v. Tempel Steel Co.*, 168 F. Supp. 2d 871, 876 (N.D. Ill. 2001). "A treating physician that has not been previously disclosed as an expert may testify regarding his observations made during the course of treatment and on matters in his personal knowledge." *Id.* "If such a physician's testimony goes beyond his personal observations, treatment, and diagnosis, however, and slips over into matters normally considered 'expert' testimony, it may be barred." *Id.*

Here, Dr. Richardson provided the following testimony:

- A person who was involved in a car accident and is more likely to bleed because his medical condition can require more medical investigation than the average person. (Richardson Dep. 110:19-24; 111:11-15, Dkt. No. 254-11).

- If someone is bleeding in the brain, it would be important for that person to go to an emergency room and a CT scan would be performed to see if there is bleeding. (*Id.* at 112:6-22).

- Someone who is experiencing intracerebral hemorrhage can experience headaches and loss of balance. (*Id.* at 121:19-24; 122:3-5; 122:14-22).

- There's no way to tell on a CT scan exactly when a bleed began. (*Id.* at 79:20-24).

- There is nothing in Marchan's CT radiology results "that suggest that there's any sort of time stamp on when [the intracerebral hemorrhage] happened." (*Id.* at 80:1-2).

Dr. Borraccini testified that:

- A person may have no symptoms when they have bleeding in their brain. (Borraccini Dep. 73:13, Dkt. 254-12).

- It is very important to have a CT scan done to determine a course of action when a patient suffers from trauma that causes an intracerebral hemorrhage. (*Id.* at 79:7-17).

Dr. Eckhardt testified that a person could survive an intracerebral hemorrhage if the bleeding was stopped. (Eckhardt Dep. 80:16-23, Dkt. 254-2).

"Because [Plaintiff] did not formally disclose any treating physicians as experts, they are treated as fact witnesses. In other words, they may testify to what they observed and the diagnoses they made, but they may not testify about what could have caused the injuries." *Levingston v. Myles*, No. 17 C 5947, 2022 WL 952279, at *4 (N.D. Ill. Mar. 30, 2022). The testimony cited above goes beyond the treating physicians' and medical examiner's observations, diagnoses, and treatment of Marchan. *See Blanton v. RoundPoint Mortg. Serv. Corp.*, 825 F. App'x 369, 373 (7th Cir. 2020) ("[A] treating physician who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, is required to submit an expert report in accordance with Rule 26(a)(2).") (internal quotations omitted).

And while Plaintiff contends that Dr. Eckhardt was disclosed, he was only disclosed in Plaintiff's Supplemental Initial Disclosures as a witness who performed the autopsy, reviewed microscopic slides, and concluded that the manner of Marchan's death was natural. (*See* Pl. Supp. Initial Disclosures, Dkt. 278-1). Dr. Eckhardt did not provide an expert report pursuant to Rule 26(a)(2); therefore, he has not been properly identified as an expert witness.

In sum, the testimony of Drs. Richardson, Borraccini, and Eckhardt will be limited to what they observed and the diagnoses they made.

Consequently, Defendants' motions to exclude are granted in part such that the following opinions are excluded: (1) Janota to the extent they relate to probable cause; (2) Dr. Husseinzadeh regarding the treatment of car accident victims; and (3) any expert testimony from by Drs. Richardson, Borraccini, and Eckhardt.

II.     **Motions for Summary Judgment**

Marchan passed away three days after he was involved in a traffic accident, charged with drunk driving, and arrested. In this case, the parties dispute the cause of Marchan's death. Plaintiff contends that the City Defendants contributed to Marchan's death by failing to transport him to the hospital after the accident and using excessive force against him. As to the County Defendants, Plaintiff asserts that they allowed Marchan to be admitted into the CCDOC and subsequently failed to provide medical treatment, despite signs that he was suffering from a serious medical condition. Defendants, on the other hand, contend that Marchan died of natural causes. More specifically, the City Defendants contend that Marchan was examined by first responders at the scene of the accident, and he refused treatment. Additionally, the City Defendants assert that they did not use any excessive force against Marchan. Likewise, the County Defendants contend that nothing they did or failed to do caused Marchan's death, as he received immediate medical attention as soon as he showed signs of medical distress while in CCDOC custody. After considering the parties' arguments and reviewing the record on summary judgment, the Court finds that Defendants are entitled to summary judgment.

A.      **Section 1983 – Denial of Medical Care**

Plaintiff asserts a Section 1983 claim for denial of medical care against the CPD Defendants, unknown CPD officers, and Sheriff Dart in his official capacity. Because discovery has closed and Plaintiff has not amended her complaint to identify the unknown CPD officers, her claims against those Defendants are dismissed. *See Williams v. Rodriguez*, 509 F.3d 392, 406 (7th Cir. 2007) (dismissing unknown and unnamed defendants from case because plaintiff failed to

identify them or serve them with process). The Court examines Plaintiff's denial of medical care claim against the CPD Defendants and Sheriff Dart below.

### 1.  CPD Defendants

Plaintiff alleges that the CPD Defendants failed to provide Marchan with medical care, despite their knowledge that he had a serious medical need. The Fourth Amendment applies to Plaintiff's denial of medical care claim because it relates to treatment before Marchan had a probable cause hearing. *Ortiz v. City of Chi.,* 656 F.3d 523, 530 (7th Cir. 2011); *Pulera v. Sarzant*, 966 F.3d 540, 549 (7th Cir. 2020) ("Before a finding of probable cause, the Fourth Amendment protects an arrestee."). Under the Fourth Amendment, it is Plaintiff's burden to provide evidence that the Defendants' actions were "objectively unreasonable" and caused Marchan's injuries. *Pulera*, 966 F.3d at 550; *see also Adams v. Durai*, 153 F. App'x 972, 975 (7th Cir. 2005) ("To establish § 1983 liability for denial of medical care, an inmate must demonstrate that he was suffering from an objectively serious medical condition that the defendants knew about but ignored."). Here, the City Defendants argue that they are entitled to summary judgment on Plaintiff's denial of medical care claim because (1) they did not have notice that Marchan had a serious medical need and (2) the alleged failure to provide medical treatment did not cause Marchan's death.

### i.  Objective Reasonableness

"Objective reasonableness is not . . . measured by whether an officer should have had notice of a medical condition, but whether an officer having actual notice of an arrestee's medical condition acted reasonably." *Saucedo v. City of Chi.*, No. 11 C 5868, 2015 WL 3643417, at *4 (N.D. Ill. June 11, 2015) (citing *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 503 (7th Cir. 2010)). Four factors inform the Court's determination of whether the officers' response to

Marchan's medical needs was objectively unreasonable: "(1) whether the officer has notice of [Marchan's] medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz*, 656 F.3d at 530. An officer may receive notice of an arrestee's medical need by word, or through observation of the arrestee's physical symptoms. *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 600 (7th Cir. 2011) (citing *Williams*, 509 F.3d at 403). Here, Defendants contend that they did not have notice of a serious medical need. Plaintiff, however, argues that "virtually everyone in the [CPD] who encountered Marchan was on notice of his serious medical needs but deliberately ignored them." (Pl. Resp. to City Defs. Mot. Summ. J. at 12, Dkt. 252). Plaintiff relies on three facts in support of her position.

First, Plaintiff points to the fact that the officers who encountered Marchan noted his condition after he was involved in the traffic accident. Specifically, Officer Pagan noted that Marchan was slurring his speech, could not stand straight, and was swaying side to side and backwards. Furthermore, Santiago stated that when Marchan came into lockup, he was unable to maintain balance and had a strong odor of alcohol and bloodshot eyes. Even so, the City Defendants respond, Marchan's symptoms were "classic symptoms of intoxication" that did not alert the officers to any serious medical condition or injury. (City Defs. Reply at 16, Dkt. 266).

In support of their argument, the City Defendants rely on *Salazar v. City of Chi.*, 940 F.2d 233 (7th Cir. 1991). There, the decedent's estate argued that the lockup officers should have taken his unusual behavior—shifting around in the cell, various states of undress, and lying on the floor rather than a cot—as a sign of serious injury. *Id.* at 241. In affirming a directed verdict for the lockup officers, the Seventh Circuit concluded that the failure to interpret this behavior as a sign of injury, rather than intoxication, did not rise to the level of deliberate indifference. *Id.* It reasoned

27

that none of the officers knew that the decedent faced a serious risk of death or other harm absent further medical attention as they did not see any sign of injury on the decedent, the decedent displayed no obvious external signs of injury, and the decedent never complained about any pain or injury. *Id*. Furthermore, while the officers knew the decedent had been in a serious traffic accident, they also knew that paramedics had treated him, and he refused further treatment. *Id*.

The same is true here. Plaintiff has not pointed to any evidence to suggest that Marchan displayed any external signs of injury or complained of pain or injury while in CPD custody. While this Court notes that *Salazar* applied the deliberate indifference standard, which requires a higher showing than is necessary to prove an officer's conduct was objectively unreasonable, *Williams*, 509 F.3d at 403, the same result is reached under the objectively unreasonable standard. *See Braun v. Vill. of Palatine*, 56 F.4th 542, 551 (7th Cir. 2022), *reh'g denied*, No. 20 3227, 2023 WL 2188741 (7th Cir. Feb. 23, 2023) (finding that officer's failure to provide medical care was not objectively unreasonable where arrestee's "physical symptoms were limited to those suggesting intoxication— confusion, slurred speech, bloodshot eyes, and difficulty balancing"). Thus, no reasonable jury could find that the City Defendants' failure to interpret Marchan's symptoms as a sign of injury, rather than intoxication, was objectively unreasonable.

The City Defendants further contend that their belief that Marchan was exhibiting signs of intoxication was reasonable because Marchan refused medical treatment. Plaintiff, citing to testimony from Torres (the other driver), disputes that Marchan was examined by emergency workers. In his deposition, Torres was asked whether he had seen any of the emergency workers examine Marchan, and he responded no. (Torres Dep. 28:15-17, Dkt. 254-10). As the City Defendants suggest, just because Torres did not see Marchan being examined does not mean that he was not examined. *See King v. Hendricks Cnty. Comm.*, 954 F.3d 981, 986 (7th Cir. 2020) ("[N]o

evidence is no evidence. It is not affirmative evidence that contradicts the officers' testimony."). In fact, Officer Pagan testified that members of the Chicago Fire Department were on the scene, they checked to ensure that Marchan was okay, and Marchan refused treatment. (Pagan Dep. 42:8-11, 51:13-15, 61:14-18 Dkt. 234-16). Similarly, Officer Richards testified that the Chicago Fire Department was on the scene and both drivers declined emergency medical services. (Richards Dep. 32:12-19, Dkt. 234-4). The reasonable inquiry takes into account the sufficiency of the steps that the officers did take, and when an ambulance was promptly called to the scene, "[t]hat action will typically qualify as reasonable." *Florek*, 649 F.3d at 600-01.

Second, Plaintiff contends that the City Defendants were aware of Marchan's serious medical need because Marchan informed Santiago that he was taking medication for his liver and that his next medication was due on November 27 at 9:00 AM. The City Defendants respond that there is no evidence that Marchan required the medication to stay alive. Instead, the evidence suggests the medication was prescribed to prevent symptoms Marchan was experiencing because of his liver cirrhosis and portal hypertension, such as itching, confusion, increased fluids in his stomach, and being in an altered mental state.

The City Defendants rely on *Pulera* in support of their position. In *Pulera*, an inmate requested his medications that he was prescribed for pain, anxiety, and depression. 966 F.3d 546. The facility's doctor believed that the inmate may have been abusing the medications and that further dosages could be dangerous, so she declined to administer the medications. *Id*. Shortly thereafter, the plaintiff attempted suicide. *Id*. at 547. The inmate asserted a claim for denial of medical care, arguing that it was unreasonable for the doctor to deny the request for medication without taking some alterative step. *Id*. at 552. The Seventh Circuit disagreed, finding that there was no evidence of causation as no reasonable factfinder could infer that the inmate would not

have attempted suicide had he received the medication. *Id*. The court explained that "[n]o evidence suggest that [the inmate] depended on his medications to stay alive; he needed them only to treat his pain and anxiety." *Id.*

Likewise, Plaintiff does not point to evidence showing that Marchan depended on his medication to stay alive. In fact, it is undisputed that Marchan was transferred to the CCDOC around 7:20 AM, before his next dose of medication was even due. Thus, no reasonable jury could find that the City Defendants were aware of a serious medical need merely because Marchan informed Santiago that he was taking medication for his liver.

Finally, Plaintiff points to Santiago's testimony that he "had a question as to if [Marchan] needed to go to the hospital" in an attempt to establish that the CPD Defendants were aware of Marchan's medical need. (Pl. Resp. to City Defs. Mot. Summ. J. at 13). The City Defendants contend that this assertion is not supported by the record as Santiago testified he had no recollection of the events at issue. During his deposition, Santiago was asked whether he recalled having a conversation with Officers Richards and Pagan when they brought Marchan to the lockup gate. (Santiago Dep. 81:19-21, Dkt. 254-5). In response, Santiago said "I believe I recollected that the desk sergeant was notified, and I don't particularly remember how it was brought up, but the desk sergeant said that he refused medical twice." (*Id*. at 81:22 - 82:1). Additionally, Santiago was asked why the desk sergeant would have been notified, and he responded, "I would have had a question as to if [Marchan] needed to go to the hospital." (*Id*. at 84:12-15).

Based on this testimony, the Court finds that Plaintiff has established that Santiago questioned whether Marchan needed to go to the hospital. Even so, Plaintiff has failed to show the City Defendants' response was objectively unreasonable as Santiago raised his concern with the desk sergeant, who then informed him that Marchan had refused medical treatment. *See Smith v.*

*Vill. of Norridge*, No. 06 C 4250, 2009 WL 210458, at *9 (N.D. Ill. Jan. 22, 2009) (finding that defendant was entitled to summary judgment on denial of medical care claim where plaintiff was seen by the paramedics and given the opportunity to receive medical care, but refused); *Wakefield v. Bartoni*, No. 21 C 867, 2023 WL 2933397, at *4 (S.D. Ill. Apr. 13, 2023) ("When allowed the opportunity to seek medical care . . . [plaintiff] refused it. . . . Therefore, the Court finds that [plaintiff's] condition was not objectively serious, and [defendant] did not act purposefully, knowingly, or recklessly in not treating [plaintiff's] bleeding that had stopped."); *Salazar*, 940 F.2d at 241 (affirming directed verdict in favor of defendants because no reasonable jury could find that the officers were deliberately indifferent to plaintiff's medical needs where he, among other things, was treated by paramedics and refused further medical treatment).

### ii. Causation

The City Defendants further argue that they are entitled to summary judgment on Plaintiff's denial of medical care claim because Plaintiff cannot establish causation, as the undisputable evidence demonstrates that Marchan's intracerebral hemorrhage was a natural injury, not caused by any trauma. Plaintiff insists in response that the City Defendants' refusal to transport Marchan to a hospital on the night of his arrest was detrimental to his condition. In support of this position, Plaintiff cites to Dr. Borraccini's testimony that it is very important to have a CT scan done to determine a course of action when a patient suffers from trauma that causes intracerebral hemorrhage. Plaintiff also relies on Dr. Richardson's testimony that a person who was involved in a car accident who is more likely to bleed because of a medical condition can require more medical investigation than the average person and if someone is bleeding in the brain, it is important for them to go to an emergency room so that a CT scan can be performed to see if there is bleeding. Additionally, Plaintiff cites to Dr. Eckhardt's testimony that it was not clear when the intracerebral

hemorrhage began and Marchan could have survived the intracerebral hemorrhage if the bleeding was stopped.

As discussed *supra*, Drs. Borraccini, Richardson, or Eckhardt have not been identified as expert witness pursuant to Rule 26(a)(2). Thus, their testimony is limited to "observations made during the course of treatment and on matters in [their] personal knowledge." *Tzoumis*, 168 F. Supp. 2d at 876; *Levingston*, 2022 WL 952279, at *4 ("[T]reating physicians may not opine about causation without being properly qualified as experts."). The portions of Drs. Borraccini, Richardson, and Eckhardt's testimony that Plaintiff relies on to try to establish causation go beyond the observations they made while treating Marchan. Thus, Plaintiff cannot rely on their testimony to establish causation.

In a further attempt to establish causation, Plaintiff relies on Dr. Husseinzadeh's opinion that all persons involved in a vehicular accident where there is structural damage to the encasing vehicle should undergo a medical examination. However, as discussed *supra*, Dr. Husseinzadeh's opinion must be excluded because she is not qualified to make such an opinion and her methodology is unreliable.

Finally, Plaintiff attempts to establish causation by relying on the City Defendants' expert, Dr. Crowley. Specifically, Plaintiff argues that Marchan's inability to maintain balance while in police custody is consistent with Dr. Crowley's explanation that a bleed in the thalamus would be expected to produce noticeable symptoms, such as weakness or numbness on the left side of the body. However, Plaintiff's contention is belied by Dr. Crowley's opinion that Marchan "had no evidence of a thalamic hemorrhage prior to the morning of [November 28]." (Crowley's Report at 3, Dkt. 234-30). Thus, Dr. Crowley's opinion does not support Plaintiff's argument that

Defendants' refusal to transport Marchan to a hospital on the night of his arrest was detrimental to his condition.

The City Defendants contends that without expert testimony, Plaintiff cannot prove causation. The Court agrees. The Seventh Circuit has held that "expert testimony is not necessary to prove causation in a § 1983 action, though it is difficult to establish causation without it." *Taylor v. City of Milford*, 10 F.4th 800, 812 (7th Cir. 2021). "The general rule is that expert testimony is not necessary to prove causation 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them.'" *Id.* at 812 (quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 864 (7th Cir. 2010)). "When the issue of causation is not disputed—for example, when an accident results in the loss of a limb—there really is no need for expert testimony on that issue." *Krischel v. Hennessy*, 533 F. Supp. 2d 790, 797 (N.D. Ill. 2008). That is not the case here. Causation is a heavily disputed issue and there are multiple theories related to the cause of Marchan's death. Thus, the Court finds that expert testimony is required to establish causation in this case, and without such testimony, Plaintiff cannot establish an essential element of her claim.

Accordingly, Plaintiff's denial of medical care claim against the CPD Defendants fails for this additional reason.

### 2. Sheriff Dart

Plaintiff also brings a claim against Sheriff Dart in his official capacity for denial of medical care. (*See* Am. Compl. ¶ 4) ("Defendant Cook County Sheriff Thomas Dart was the duly elected Sheriff of Cook County and the employer of Defendants Unknown Cook County Sheriff Officers. Defendant Cook County Sheriff Thomas Dart is liable for the wrongful acts of the

Defendants Unknown Cook County Sheriff Officers while acting in the course and scope of their employment."). "Official-capacity suits are simply 'another way of pleading an action against an entity of which an officer is an agent." *Selmani v. Vill. of Bartlett*, 515 F. Supp. 3d 882, 889 (N.D. Ill. 2021) (quoting *Monell v. Dep't of Social Serv.*, 436 U.S. 658, 690 (1978)). "To prevail on a section 1983 claim against a municipality, a plaintiff 'must challenge conduct that is properly attributable to the municipality itself.'" *First Midwest Bank Guardian of Est. of LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021). Three types of actions can support municipal liability under Section 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id*.

Here, Plaintiff contends that "discovery has revealed the existence of wide-spread policy that resulted in the violation of Marchan's constitutional rights." (Pl. Resp. to County Defs. Mot. Summ. J. at 24, Dkt. 249). Specifically, Plaintiff contends that the County Defendants violated Policy 702 by allowing Marchan into the jail even though his medical condition required the County to reject him and turn him back over to the CPD. Plaintiff also asserts that taking Marchan inside the dispensary after he fell violated Policy 147, which purportedly required the officers to call 911 or the communication center to request a response from the emergency medical services prior to initiating medical aid. Additionally, Plaintiff contends that Officer Anthony Monegan violated the International Association of Chiefs of Police's Standards of Conduct by making fun

34

of Marchan's fall. Finally, Plaintiff asserts that the County Defendants violated Policy 115.3.1 by failing to supply Marchan with appropriate jail outer wear.

"When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003). "Thus, under the *Monell* widespread practice theory, Plaintiffs must establish an unconstitutional pattern of conduct, including incidents other than ones involving them, to give rise to the inference that an unconstitutional custom, policy, or practice exists." *Fairley v. Andrews*, 430 F. Supp. 2d 786, 801 (N.D. Ill. 2006), *aff'd sub nom. Fairley v. Fermaint*, 482 F.3d 897 (7th Cir. 2007).

Here, Plaintiff argues that "[a]n unconstitutional policy may be inferred where an official has failed to properly train its officers to avoid violating prisoners' rights." (Pl. Resp. to County Defs. Mot. Summ. J. at 27) (citing *Spiegel v. City of Chi.*, 920 F. Supp. 891, 900 (N.D. Ill. 1996), *aff'd sub nom. Spiegel v. Cortese*, 196 F.3d 717 (7th Cir. 1999), *as amended* (Jan. 7, 2000)). In *Spiegel*, the court noted that "[a]n unconstitutional policy can also be inferred when the complaint charges the municipality with having engaged in improper conduct directly, such as a claim that the municipality itself failed to properly train its officers to avoid inflicting unconstitutional injuries." 920 F. Supp. at 900 (citing *City of Canton v. Harris,* 489 U.S. 378, 387 (1989)). Additionally, the court explained that "[l]iability would attach in that case where police, while exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to policymakers who were deliberately indifferent to the need." *Spiegel,* 920 F. Supp. at 900. Nevertheless, the court found that plaintiff's complaint did not

"demonstrate more than the one incident complained of where [the] alleged faulty policy or training created a constitutional violation." *Id*.

Plaintiff's contention that an unconstitutional policy may be inferred in this case suffers from the same flaw. Notably, Plaintiff relies on Janota's opinion that the CCSO failed to supervise and discipline its officers. However, as noted by the County Defendants, Janota's opinion is based solely on Marchan's case. During his deposition, Janota agreed that his opinion regarding the County's alleged failure to supervise and discipline its officers was based on one incident— Marchan's death—and the number of people that "dropped the ball and didn't follow the policy." (Janota Dep. 137:10-17). Moreover, Janota testified that he was not directly aware of any other instances where the CCDOC policies were not followed. (*Id*. at 215:8-11). Thus, the Court is unable to infer an unconstitutional policy based on the County Defendants' alleged failure to train and discipline their officers with respect to this isolated incident.

Apparently recognizing the weakness in her argument, Plaintiff argues that "a pattern can be shown by a course of conduct or repeated unconstitutional acts by several different actors within a single case." (Pl. Resp. County Defs. Mot. Summ. at 28). Plaintiff contends that such is the case here because everyone who encountered Marchan ignored his requests for medical attention. The County Defendants disagree, arguing that Marchan was not ignored—he was medically screened upon arrival at CCDOC, provided special detox housing, and placed under medical supervision as soon as he fell.

"[N]ormally, the mere allegation of a single act of unconstitutional conduct by a municipal employee will not support the inference that such conduct was pursuant to official policies. On the other hand, where the plaintiff alleges a pattern or a series of incidents of unconstitutional conduct . . . courts have found an allegation of policy sufficient to withstand a dismissal motion." *Powe v.*

36

*City of Chi.*, 664 F.2d 639, 650 (7th Cir. 1981). "The policy can be viewed as 'systemic in nature' if the plaintiff sustains the same constitutional deprivation multiple times—even if those deprivations arise from a single series of facts." *Garrett v. Dart*, No. 09 C 1398, 2010 WL 2136670, at *3 (N.D. Ill. May 26, 2010), *as amended* (July 8, 2010).

In *Powe*, the Seventh Circuit held that a plaintiff who was arrested four times on the same vague warrant successfully alleged a *Monell* violation because multiple employees in different departments were involved in failing to create an adequate description of the suspect. *Id*. at 651. On the other hand, in *Love v. Cook Cnty.*, an inmate who was detained in a segregated unit for two and a half years asserted a Section 1983 claim, arguing that multiple defendants had policymaking authority, knowledge of his unlawful detention, and the power to take corrective action, and yet they all did nothing. 82 F. Supp. 2d 911, 913, 917 (N.D. Ill. 2000). There, the court found that the inmate's allegations amounted to a "random, isolated incident directed solely against him." *Id*. at 917.

Although neither case is directly analogous, Plaintiff's denial of medical care claim is more like the claim in *Love* than *Powe*. Plaintiff does not allege that Marchan was arrested multiple times, each resulting in a denial of medical care. Instead, she alleges that Marchan was detained once and during that detention, the County Defendants failed to provide medical care. As in *Love*, this amounts to a "random, isolated incident directed solely against [Marchan]." *Id*. Thus, Plaintiff has failed to establish that a widespread practice or custom caused the alleged deprivation of Marchan's constitutional rights.

In a further attempt to establish her official capacity claim, Plaintiff contends that "the reasonable inference from the totality of the evidence proves" that Sheriff Dart and others with final policy making authority knew and approved of the practice of admitting arrestees with serious

medical conditions without providing adequate medical care. (Pl. Resp. to County Defs. at 29). In response, the County Defendants argue that, at this stage in the case, Plaintiff is required to do more than draw inferences from the totality of the evidence. The Court agrees. "A motion for summary judgment requires the responding party to come forward with the evidence that it has— it is the put up or shut up moment in a lawsuit. Statements in a brief are not evidence and are not entitled to any evidentiary weight." *Compton v. Miles*, No. 11 C 1974, 2012 WL 3987590, at *2 (N.D. Ill. Sept. 5, 2012) (internal citations omitted). Thus, Plaintiff has failed to establish that the alleged violation of Marchan's constitutional rights was caused by an official with final policy-making authority.

Accordingly, Plaintiff's denial of medical care claim against Sheriff Dart cannot withstand summary judgment.

### B. Section 1983 – Excessive Force

Plaintiff asserts a Section 1983 excessive force claim against the CPD Defendants and unknown CPD officers.[11] The City Defendants argue that they are entitled to summary judgment on Plaintiff's excessive force claim because there is no evidence from which a reasonable jury could conclude that any of the involved officers used excessive force against Marchan. As an initial matter, Plaintiff contends that she must be given the benefit of the doubt because "this is a case 'where the person who was subjected to the alleged constitutional violation (excessive force) dies and leaves much of the evidence with the defendants.'" (Pl. Reply at 9) (quoting Order at 5, Dkt. 92). While recognizing the tragic circumstances that this case presents, the Court notes that Plaintiff cites from the order addressing the City Defendants' motion to dismiss, which is governed

---

[11] As discussed *supra*, because discovery has closed and Plaintiff has not amended her complaint to identify the unknown CPD officers, her excessive force claims against those Defendants are also dismissed. *See Williams*, 509 F.3d at 406 (dismissing unknown and unnamed defendants from case because plaintiff failed to identify them or serve them with process).

by a different legal standard. (*See* Order at 5) (holding that Rule 8(a) does not require Plaintiff to allege "when, how, or to what degree Defendant Officers used force or exerted physical pressure on Marchan"). We are now at the summary judgment stage of the case, and Plaintiff is required to come forth with evidence in support of her claims. *See Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000) (plaintiff must present evidence from which the jury could reasonably find for him).

Notwithstanding her view that she is entitled to the benefit of the doubt, Plaintiff argues that there is a genuine issue of material fact as to whether excessive force was used because Marchan's sister, Mukite, testified that Marchan told her that an aggressive officer beat him up. The City Defendants contend that Mukite's testimony is inadmissible hearsay that cannot be considered on a motion for summary judgment. They are correct.

A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment. *Driver v. Chatys*, No. 15 C 4041, 2017 WL 4339819, at *5 (N.D. Ill. Sept. 29, 2017) (citing *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2011)). Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801. Here, Mukite's out-of-court statement is being offered for the truth of the matter asserted—that Marchan was beaten up. This statement constitutes inadmissible hearsay, and therefore is insufficient to establish that the CPD Defendants used excessive force. *See Fox v. Faith*, No. 11 C 3111, 2013 WL 253703, at *2 (C.D. Ill. Jan. 23, 2013) ("Plaintiff's only evidence of [the officer's] involvement in the excessive force is [p]laintiff's inadmissible hearsay statement that other inmates told [plaintiff] that they saw [the officer] hit [p]laintiff. The Court cannot consider inadmissible hearsay statements.").

Even if Mukite's testimony was admissible, it fails to establish a genuine issue of material fact because it does not identify who used the alleged excessive force, what alleged force was used, when the alleged force was used, or the circumstances leading up to the alleged force. *See Henry v. City of Creve Coeur*, No. 19 C 1234, 2021 WL 3909656, at *5 (C.D. Ill. Aug. 30, 2021) ("Saying an officer used excessive force does not make it so. Simply put, 'conclusory statements not grounded in specific facts are not enough to stave off summary judgment.'") (quoting *King v. Ford Motor Company*, 872 F.3d 833, 840 (7th Cir. 2017)).

Additionally, in support of her argument that the officers used excessive force, Plaintiff points to the fact that the medical examiner found "no less than eight blunt force trauma injuries on Marchan's body." (Pl. Resp. to City Defs. Mot. Summ. J. at 9). The City Defendants contend that this is an improper *res ispa loquitor* argument. The Court agrees. *See Brownell v. Figel*, 950 F.2d 1285, 1292 (7th Cir. 1991) ("[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must set forth specific facts showing that there is a genuine issue of material fact which requires a trial. To do so, the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts.") (internal citations omitted). Plaintiff has not pointed to any evidence to connect the officers alleged use of excessive force to the blunt force trauma injuries on Marchan's body.

As to Lieutenant Kendzior and Sergeants Bowen and Lohse, the City Defendants argue that they cannot be held liable because they were not present when the officers were processing Marchan's arrest and they had no contact with him. In response, Plaintiff argues that the City Defendants' position is unsupported by the evidence, as there is testimony confirming that Lieutenant Kendzior and Sergeant Lohse were on duty on November 26, 2017. Even if they were on duty, such evidence does not establish that they were personally involved with Marchan.

Plaintiff further contends that Santiago testified that the desk sergeant came to lockup and refused his request to have Marchan taken to the hospital. However, Santiago also testified that he was not sure whether Sergeant Lohse was the desk sergeant. Speculative testimony is not enough to survive summary judgment. As to Sergeant Bowen, Plaintiff does not cite to any facts regarding her personal involvement or whether she was even on duty on November 26, 2017. Thus, Plaintiff has not pointed to any evidence to demonstrate that Lieutenant Kendzior or Sergeants Bowen and Lohse were personally involved.

Accordingly, Plaintiff's excessive force claim cannot withstand summary judgment.

### C.  Section 1983 – Failure to Intervene

Plaintiff asserts a Section 1983 failure to intervene claim against the CPD Defendants, unknown CPD officers,[12] and Sheriff Dart in his official capacity.

#### 1.  CPD Defendants

The City Defendants argue that they are entitled to summary judgment on Plaintiff's failure to intervene claim because Plaintiff cannot establish a genuine issue of material fact on the underlying Fourth Amendment claims. The Court agrees. *See Turner v. City of Champaign*, 979 F.3d 563, 571 (7th Cir. 2020) ("The fate of a plaintiff's failure to intervene claim is closely linked to that of her excessive force claim since, by definition, if there is no excessive force then there can be no failure to intervene.") (internal alterations omitted).

Additionally, the City Defendants argue that the failure to intervene claim fails with respect to Lieutenant Kendzior and Sergeants Lohse and Bowen because they did not have a reasonable opportunity to intervene, as they were not present at the scene of the accident, in the holding cell while Marchan was being process, or in the lockup. As discussed *supra,* while Plaintiff contends

---

[12] Again, Plaintiff's claims against the unknown CPD officers are dismissed because she has filed to identify them at this late stage in the case.

that Lieutenant Kendzior and Sergeant Lohse were on duty, she has not established that they were personally involved with any issue related to Marchan. Nor has Plaintiff established that Lieutenant Kendzior, Sergeant Lohse, or Sergeant Bowen were present during any of the events at issue. Thus, Lieutenant Kendzior, Sergeant Lohse, and Sergeant Bowen cannot be held liable for failure to intervene. *See Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997) (holding that supervisor could only be held liable if (1) he knew the officer was using excessive force or if he was deliberately indifferent to the officer's actions *and* (2) had a realistic opportunity to intervene to prevent the use of excessive force).

### 2. Sheriff Dart

Plaintiff contends that Sheriff Dart is liable for failing to intervene because Nurse Lee and Officers Coleman, Vereen, and Monegan violated policy. But the County Defendants are correct that Sheriff Dart cannot be held liable here under *respondeat superior* for the alleged misconduct of his employees. "Section 1983 does not allow actions against individuals merely for their supervisory role of others. To be liable, a supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019) (internal quotations omitted). Plaintiff has not pointed to any evidence to demonstrate that Sheriff Dart knew about, facilitated, approved, condoned, or turned a blind eye to Nurse Lee and Officers Coleman, Vereen, and Monegan's conduct. Thus, Plaintiff's failure to intervene claim against Sheriff Dart fails as a matter of law.

### D. Qualified Immunity

In addition to the arguments addressed above, the City Defendants argue that they are entitled to qualified immunity on each of Plaintiff's Section 1983 claims. "Qualified immunity 'protects government officials from liability for civil damages when their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known."' *Taylor*, 10 F.4th at 806 (quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010)). Once a defendant invokes the doctrine of qualified immunity in a summary judgment motion, "the burden shifts to the plaintiff to defeat it." *Id.* (internal quotations omitted). "Whether qualified immunity applies turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). If the plaintiff does not make both showings, the defendant's motion for summary judgment must be granted. *Est. of Davis v. Ortiz*, 987 F.3d 635, 639 (7th Cir. 2021); *see also Smith*, 10 F.4th at 737 ("If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity.") (emphasis in original).

"A right is clearly established where it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620 (7th Cir. 2022) (internal quotations omitted). A plaintiff may demonstrate a clearly established right in three ways: by (1) identifying a closely analogous case finding the alleged violation unlawful; (2) identifying in the relevant case law such a clear trend that the Court can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time; or (3) arguing that the defendants' conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully even in the absence of analogous case law. *Id.* at 620-21. Here, the City Defendants contend that Plaintiff has not carried her burden to show that there was a violation of Marchan's constitutional rights or that the alleged rights were clearly established at the time of the alleged violation.

As to the failure to obtain medical care claim, Plaintiff argues that "an arrestee's right to be provided medical care was clearly established long before 2017." (Pl. Resp. to City Defs. Mot. Summ. J. at 25). However, the City Defendants contend that Plaintiff has failed to identify the right at issue with the required level of specificity. "The Supreme Court has cautioned us not to define the constitutional right in question at a 'high level of generality.'" *Dockery v. Blackburn*, 911 F.3d 458, 466-67 (7th Cir. 2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). Thus, "[q]ualified immunity cannot be defeated simply by 'alleging a violation of extremely abstract rights.'" *Dockery*, 911 F.3d at 466-67 (quoting *White*, 580 U.S. at 79). For purposes of qualified immunity, the legal right to treatment for serious medical needs does not have to be litigated and then established disease by disease or injury by injury. *See Est. of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017). Here, the right at issue is appropriately defined as "a pre-arraignment detainee's Fourth Amendment right to 'objectively reasonable' treatment." *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018). The Seventh Circuit has "explained that this right is assessed with reference to the defendant officer's notice of the detainee's medical need, the seriousness of the medical need, the scope of the alleged required treatment, and police interests." *Id.* As addressed *supra*, Plaintiff has not demonstrated that the CPD Defendants' failure to provide medical care violated Marchan's Fourth Amendment rights. Thus, with regard to her denial of medical care claim, Plaintiff has failed to establish the first prong of the qualified immunity analysis.

Additionally, while Plaintiff has cited to several cases in support of her argument that a clearly established right was violated, such cases are not analogous as they all determined that qualified immunity did not apply because, unlike here, the defendants were aware of the plaintiff's serious medical need. *See e.g. Ortiz,* 656 F.3d at 538 (finding that officers were not entitled to qualified immunity where it was undisputed that defendants had notice of plaintiff's medical need

because plaintiff requested a doctor); *Currie v. Chhabra*, 728 F.3d 626, 631 (7th Cir. 2013) (finding that defendants were not entitled to qualified immunity where family members called jail to inform officers about detainee's mental illness and diabetic condition); *Awalt v. Marketti*, 74 F. Supp. 3d 909 (N.D. Ill.), *supplemented*, 75 F. Supp. 3d 777 (N.D. Ill. 2014) (finding that officers were not entitled to qualified immunity because there were genuine questions of material fact regarding whether the officers knew that detainee was suffering from seizures while in jail); *Est. of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017) (finding that officer was not entitled to qualified immunity because plaintiff offered sufficient evidence for a jury to find that officer knew about inmates risk of suicide); *Est. of Perry v. Wenzel*, 872 F.3d 439, 455 (7th Cir. 2017) (finding that officers were not entitled to qualified immunity where a reasonable jury could find that the officers had notice of a serious medical need). Plaintiff has not pointed to any analogous cases where defendants were not aware of a serious medical need or argued that Defendants' conduct was so egregious and unreasonable; thus, Plaintiff fails to establish the second prong of the qualified immunity analysis.

Plaintiff also fails to establish a clearly established right as it relates to her excessive force claim. Again, Plaintiff has not pointed to any analogous cases or argued that Defendants' conduct was so egregious and unreasonable. Instead, Plaintiff argues that a jury must be allowed to decide and consider whether any excessive force was used because Marchan passed away without being able to identify who allegedly battered him. As discussed *supra*, at the summary judgment stage, Plaintiff is required to put forth evidence is support of her claims. *See Conley*, 215 F.3d at 709. Thus, because Plaintiff has failed to identify a clearly established right, the City Defendants are entitled to qualified immunity on Plaintiff's excessive force claim. *Smith*, 10 F.4th at 737 ("If

*either* inquiry is answered in the negative, the defendant official is protected by qualified immunity.").

### E. Section 1983 - *Monell*

Plaintiff brings a Section 1983 *Monell* claim against the City of Chicago asserting that the CPD Defendants' misconduct "was undertaken pursuant to the policy and practice of the City of Chicago." (Am. Compl. ¶ 112). The same standards that apply to Plaintiff's official capacity claim against Sheriff Dart apply to Plaintiff's *Monell* claims against the City of Chicago. The City Defendants argue that Plaintiff's *Monell* claim fails at the outset because Plaintiff has failed to establish a constitutional violation. The Court agrees. *See Swanigan v. City of Chi.*, 775 F.3d 953, 962 (7th Cir. 2015) ("If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations."). As discussed *supra*, Plaintiff has failed to prove a constitutional violation; thus, her *Monell* claim also cannot withstand summary judgment.

### F. State Law Claims

Plaintiff asserts claims under state law against the CPD Defendants, the City of Chicago, Sheriff Dart, and unknown Cook County Sheriff officers.[13] Notably, "[t]he Survival Act does not create a statutory cause of action and instead allows a representative of the decedent to maintain those statutory or common-law actions that had already accrued to the decedent prior to the decedent's death." *Myers v. Heritage Enterprises, Inc.*, 332 Ill. App. 3d 514, 516-17(2002). Defendants contend that for this reason, Plaintiff's survival act claims are duplicative of her section 1983 claims. The Court agrees. While the Survival Act would allow Plaintiff to recover any

---

[13] Because discovery has closed and Plaintiff has not amended her complaint to identify the unknown Cook County Sheriff officers, her state law claims against those Defendants are dismissed. *See Williams*, 509 F.3d at 406 (dismissing unknown and unnamed defendants from case because plaintiff failed to identify them or serve them with process).

damages Marchan incurred while he was alive as a result of any section 1983 violations, the Court has found that no such violations occurred. Thus, Plaintiff's Survival Act claim is subject to dismissal. The Court considers the merits of Plaintiff's wrongful death claims below.

### 1. City Defendants

The City Defendants argue that they are entitled to summary judgment on Plaintiff's wrongful death because they have immunity under the Illinois Tort Immunity Act. Regarding medical care, the Illinois Tort Immunity Local Governmental and Governmental Employees Act ("Tort Immunity Act") provides that:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this Section requires the periodic inspection of prisoners.

745 ILCS 10/4-105.

Thus, the City Defendants contend that to the extent Plaintiff's wrongful death claim is based on the CPD Defendants' failure to provide medical care, such claim fails because the CPD Defendants were not aware of Marchan's need for care. As discussed *supra*, the Court has found that the CPD Defendants were not aware that Marchan had a serious medical need. And even assuming that they were, no reasonable jury could find that they engaged in willful or wanton conduct by failing to take reasonable action to summon medical care. Accordingly, the City Defendants are entitled to immunity on Plaintiff's wrongful death claim to the extent that it is based on the failure to provide medical care. *See Belbachir v. Cnty. of McHenry*, No. 06 C 1392, 2012 WL 4595344, at *7 (N.D. Ill. Sept. 28, 2012) (finding that defendants were entitled to immunity under section 745 ILCS 10/4–105 of the Tort Immunity Act because "[n]one of the

individual defendants were shown to have been subjectively aware [that detainee] was at substantial risk of suicide.").

2. **Sheriff Dart**[14]

Like the City Defendants, the County Defendants also argue that they are entitled to summary judgment on Plaintiff's wrongful death claim because Sheriff Dart is immune from liability under the Tort Immunity Act. The Court agrees. As discussed above, Section 4-105 of the Tort Immunity Act provides that "[n]either a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody." Here, Plaintiff alleges that Sheriff Dart, through his agents, failed to seek medical care for Marchan. However, Plaintiff has failed to establish that Sheriff Dart knew that Marchan needed medical care and, through willful and wanton conduct, failed to take reasonable action to summon medical care. Thus, Sheriff Dart is entitled to immunity on Plaintiff's wrongful death claim.[15]

---

[14] The County Defendants also contend that they are entitled to summary judgment on Plaintiff's wrongful death claim because Sheriff Dart did not breach any duty to Marchan or proximately cause Marchan's death. Notwithstanding Plaintiff's arguments regarding whether a breach occurred, the Court finds that Plaintiff's wrongful death claim fails because she cannot establish causation. As discussed *supra*, in this case, expert testimony is required to prove causation, and without such testimony, Plaintiff cannot establish an essential element of her claim.

[15] The Cook County Defendants argue that Sheriff Dart is also subject to immunity under Sections 2-201, 2-109, and 6-106 of the Tort Immunity Act. Having found that Sherriff Dart is subject to immunity under Section 4-105, the Court need not determine whether Sheriff Dart is also subject to immunity under additional sections of the Tort Immunity Act.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants' motions to exclude are granted in part and denied in part, and Defendants' motions for summary judgment are granted. Judgment is entered in favor of Defendants.

**DATED**: September 30, 2024    **ENTERED**:

LASHONDA A. HUNT
United States District Judge